FULLER *et al. v.* METROPOLITAN LIFE INS. CO. *et al.*

(*Circuit Court, S. D. New York.* January 7, 1889.)

1. COURTS—FEDERAL JURISDICTION—AMOUNT—DISMISSAL.

Act Cong. March 3, 1875, § 5, providing that a cause in the circuit court must be dismissed if at any time during its progress the court discovers it has no jurisdiction, does not mean that a suit, properly brought, must be dismissed because defendant by admissions or failure to deny reduces the amount in dispute to less than the statutory sum.

2. INSURANCE—POLICY—CONSTRUCTION.

Defendant company issued a life insurance policy, reciting that it was upon the "reserve dividend plan." and that, if the stipulated premiums were paid for 10 years. the company would pay to the designee of the policy its equitable proportion of the "reserve dividend fund." *Held,* that the meaning of the parties by the use of the terms quoted must be ascertained by recourse to contemporaneous insurance literature; and, it appearing that the only reserve dividend plan known at that time was the one devised and copyrighted by W. P. Stewart, and that defendant company had engaged him as actuary, secured the the right to use his plan, and used his "key" in explaining to policy-holders the meaning of the plan, the company's liability must be ascertained by the principles of that plan.

In Equity.

Bill for a discovery and an accounting, brought by Harriet A. Fuller and Austin B. Fuller against the Metropolitan Life Insurance Company of the city of New York, and Joseph F. Knapp. Many of the leading facts appear in *Fuller* v. *Knapp,* 24 Fed. Rep. 100. See, also, 31 Fed. Rep. 696. The complainants seek to ascertain the amount due under certain stipulations of a policy of life insurance, which provide that the policy is issued upon the "reserve dividend plan." The defendants insist that the complainants confided to the board of directors of the insurance company an absolute discretion to apportion the reserve dividend, and that their determination as to the amount is conclusive. The complainants not only deny that this proposition contains a correct exposi-

tion of the law, but they contend, further, that it has no application to a cause like this where, by reason of the ambiguity of the contract, it is necessary to ascertain what is the meaning of its terms; that the court must at the outset determine the principles by which the defendants shall be governed and guided in making up the account. The bill has been attacked at various times, and its sufficiency upheld by this court. The cause now comes on for final hearing.

*Levi A. Fuller,* for complainants.

*William H. Arnoux, William B. Hornblower,* and *Haley Fiske,* for defendants.

COXE, J. The first proposition argued by the defendants is that the court has no jurisdiction, for the reason that the amount involved does not exceed $500. Act March 3, 1875. The bill alleges that $1,231 is due the complainants from the reserve endowment fund. The defendants insist that this sum must be disregarded in fixing the jurisdictional amount, for the reason that they admit it to be due, and offer to pay it, in their answers, and therefore it is not in controversy. The soundness of this proposition may well be doubted. If it can be maintained, the defendant in a vast number of actions, both at law and in equity, both *ex contractu* and *ex delicto,* will have it in his power to oust the court of jurisdiction by admitting that the whole or a part of the plaintiff's demand is due. If, for instance, this suit were to recover the $1,231 alone, can it be said that the court has no jurisdiction to enter judgment because of the defendants' admission that the amount sued for is due? The amount actually due at the time the action is commenced is the amount in controversy. To recover that sum it is necessary for the plaintiff to bring the defendant into court; and, having been legally brought there, he cannot defeat the jurisdiction by an offer to pay. If the court has jurisdiction when the suit is commenced, it has it for all time. This rule is well-nigh universal, and it is not necessary to consider the exceptions to it here. The defendant cannot change the character of the suit in this regard.

It is true that under section 5 of the act of 1875 the cause should be dismissed if, at any time during its progress, the court discovers that it has no jurisdiction. The discovery, though not made until the end of a suit, relates back to the lack of jurisdiction at the beginning. If the court had no jurisdiction when the suit was begun, there must be a dismissal, even though the fact was not ascertained until the close of the litigation. Surely this section does not mean that a suit, properly brought, may be dismissed because the defendant by admissions or failure to deny reduces the amount in dispute to less than the statutory sum. If this be the true construction, the stronger the plaintiff makes his case the greater danger he will incur of being turned out of court. If, for instance, on the trial, he proves his case so conclusively that the defendant can offer nothing in reply, and in open court concedes the justice of the plaintiff's demand, it will be the duty of the court at that very moment to dismiss the cause, for the reason that there is nothing in controversy between the parties. This was not the intention of the law-makers. There

is, however, sufficient upon the other branch of the case to give the court jurisdiction. The complainants seek to recover under the reserve dividend clause of the policy. The defendants concede that there is due $387. The complainants insist that it is four times that amount. This controversy cannot be settled finally until a master has taken the account. Should it then be determined that there is more than $500 involved, the wisdom of retaining the cause will be apparent. On the other hand, should the master find that there is less involved, the defendants' point will be as available then as now. Clearly, at this stage of the litigation, the objection should be overruled. The defendants dispute the jurisdiction of the court upon other grounds, but it seems that they are all covered by former adjudications of this court, and should not be considered again. It would be an intolerable hardship to the complainants, after having informed them that that their bill was properly brought, to turn them out of court at this late period, and after a tedious and expensive investigation, for want of equity.

The main question arises upon the interpretation to be placed upon the policy of insurance. On the 2d of March, 1874, the defendant the Metropolitan Life Insurance Company issued its policy of insurance for $10,000 upon the life of Austin B. Fuller, for the benefit of Harriet A. Fuller, for the term of 10 years. The policy contains this provision:

"At the request of the assured, this policy is insured upon the 'Reserve Dividend Plan,' and the said company agree that, should the premiums be paid as herein stipulated for ten full years from the date hereof, and that, should the life insured survive said period of ten full years, that said company will pay to the designee of this policy, at the expiration of said period of ten years, its equitable proportion of the reserve dividend fund in cash, the same to be receipted for to said company."

These words, "reserve dividend plan," and "reserve dividend fund," standing by themselves, are meaningless. In order properly to construe them it is necessary to have recourse to contemporaneous insurance literature. Without such explanation it will be impossible to render judgment upon the contract. What was the agreement between the parties? Upon what proposition did their minds meet? Fuller paid $2,834 in premiums. The obligation resting upon him was fully performed. This is conceded. What did the defendant, the insurance company, undertake in consideration of this money? What obligation did it assume? When this question is answered, when the contract which was actually entered into is ascertained, the defendants must be held to its stipulations. It is not necessary to consider whether the contract was a wise and prudent one, for that is immaterial. The cause differs from *Uhlman* v. *Insurance Co.*, 109 N. Y. 421, 17 N. E. Rep. 363, and *Pierce* v. *Society*, 145 Mass. 56, 12 N. E. Rep. 858. These cases represent with great clearness the opposing views upon the question whether a policyholder can compel an insurance company to account. In both, the terms of the contract were clear. In the case at bar the defendants insist, not only that they have the right to apportion the account, but, as a preliminary step, that they shall be permitted to place their own interpreta-

tion upon an ambiguous and disputed contract. This position is not sustained by the *Uhlman Case*. On the contrary, it is disaffirmed. At page 432 the court say:

"The plaintiff and all others similarly situated, have the right, upon proper allegations of fact showing that the apportionment made by the defendant is not equitable, or has been based upon erroneous principles, to have a trial, and make proof of such allegations, and, if proved, the court will declare the proper principles upon which the apportionment is to be made, so as to become an equitable apportionment."

The complainants seek to explain a written instrument by parol, not to change or enlarge it. The only reserve dividend plan of which the public had knowledge prior to the date of the policy was that devised and copyrighted by W. P. Stewart and explained by him in the little volume entitled "Key to Reserve Dividend Plan." The parties are presumed to have contracted in the light of what was known by them in March, 1874. A person desiring information on the subject would have sought for it in this book, or from those who were familiar with its contents. Stewart maintained that he, and he alone, under his copyright of January 1, 1871, had the right to use this plan, and confer that right upon others. In August, 1872, the defendant, the insurance company, entered into a contract with Stewart, by which it purchased the right to use the "reserve dividend or reserve endowment plans," and agreed to employ him as its actuary. His principal occupation was, under this contract, to instruct agents as to the peculiar features of these plans. Thereafter the company advertised to the world that the reserve dividend plan originated with its actuary, and belonged to it. In short, the defendants clearly and emphatically adopted Stewart's reserve dividend plan as their plan, and commenced operating under it, having proclaimed their exclusive right so to do. From 1869 to the date of the complainants' policy this plan was being operated by the Widows' and Orphans' Company, and subsequently by the Metropolitan Company, and explained by the agents of both. The proof is convincing that during this period it was never explained otherwise than as stated by Stewart, and that it was never practiced in any other way. An applicant, in March, 1874, about to accept a policy containing this vague and technical language, would most surely have appealed for information to the insurance literature of the day, or to those having knowledge of the subject. But one answer would have been given: "We know of no plan by that name but Stewart's." His plan was the reserved dividend plan. There was no other. Nowhere could the applicant have been informed as to the details of the plan which is now advanced by the defendants. If at that time the company had adopted another and a different plan, or had materially modified Stewart's plan, they should have so stated in the policy, or published it in some form to the world. They contracted with reference to *the* reserve dividend plan, and it will hardly do for them to say now that what they meant was *a* reserve dividend plan. Having left the policy in this lax and uncertain form, when they had the power to make it definite and certain, they should not be surprised that Fuller gave the words used their general,

open, and public meaning, and not a secret and unusual one. Fuller testifies that the plan was carefully explained to him by the company's general agent in great detail from the "key" above referred to. But even were the defendants in a position to show that the words in the policy referred to their own particular plan,—the plan under which they have computed the dividend at $387,—and not the plan as it was generally and publicly understood, it is thought that the proof fails to establish the adoption of such a plan by them at and prior to the date of the policy. If the book intended for the exclusive use of their agents can be said to contain a plan, it is not, when taken in its entirety, inconsistent, but rather in line, with Stewart's plan. The reserve dividend, which they there assert will, upon a "conservative assumption," amount to 60 per cent. and upwards, could hardly be arrived at by a plan which yields a dividend of about 13½ per cent.

It is unnecessary to discuss the evidence further. Suffice it to say that I am convinced that the parties to this contract stipulated for a reserve dividend upon a plan then well known to the public, and understood by those versed in insurance matters as Stewart's plan, the details of which are explained by him at pages 10 and 11 of the book above referred to. It was upon this proposition that the minds of the parties met. It was in consideration of a dividend upon this plan that Fuller paid his premiums for 10 years. It is in accordance with the terms of this contract that the complainants are entitled to an account. There should be a decree in favor of the complainants for an accounting.