## BROWN v. EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES.

### (Circuit Court, S. D. New York. January 6, 1906.)

1. INSURANCE—POLICY HOLDER IN LIFE COMPANY—RELATION TO COMPANY.

   The relation between the holder of a policy of life insurance issued on the mutual plan, which entitles him to share in the surplus of the company after payment of losses and expenses and the accumulation of the legal reserve, is not in a legal sense fiduciary, but contractual.

2. SAME—RIGHTS IN SURPLUS FUND—CHARTER AND CONTRACT CONSTRUED.

   By the charter of a life insurance company granted by the state of New York prior to the enactment of any statute fixing the amount of legal reserve required to be held by such companies, it was provided that, after the payment of dividends on the capital stock not to exceed a fixed per cent., "the earnings and receipts of said company over and above the dividends shall be accumulated." It also provided, as did also its policy contracts, that when ascertained each policy holder should be credited with an equitable share of the surplus, according to such principles and methods as might be adopted by the company. Held, that such charter did not limit the accumulations of the company to the legal reserve, nor did it, or the policy contracts, require the distribution to policy holders of all of the net surplus above such reserve, but only of an equitable portion thereof, to be determined by the company according to such methods and principles as it might adopt, which must be regarded prima facie as equitable.

3. SAME—RIGHT TO MAINTAIN SUIT FOR ACCOUNTING.

   Under such charter and contracts, as construed by the Court of Appeals of New York, which construction is binding upon a federal court, a policy holder has no actual interest in the surplus of the company, until it has been apportioned, and there is no such trust relation between him and the company with respect thereto as will entitle him to maintain a suit in equity for an accounting or to control the discretion of the company in making an equitable apportionment.

4. SAME.

   A policy holder in a life insurance company, entitled by his contract to share in its surplus, but which company is controlled by its stockholders, cannot maintain a suit in equity against it for an accounting and the appointment of a receiver, based on the alleged mismanagement and misappropriation of its funds by its officers.

5. EQUITY—JURISDICTION—SUIT FOR ACCOUNTING.

   The right to an accounting and discovery in equity is incidental to some other principal ground upon which the jurisdiction in equity is based, such as a trust relation between the parties, or the necessity of adjusting complicated accounts, and cannot rest alone on an alleged breach of contract by defendant.

6. INSURANCE—SUIT FOR RECEIVER—NEW YORK STATUTE.

    Laws N. Y. 1892, p. 1958, c. 690, § 56, which expressly prohibits the appointment of a receiver for, or the direction of an accounting by, an insurance company, unless the Attorney ·General makes the application or approves the same, is a part of the contract of every policy holder of a New York insurance company, although he may be a citizen of a foreign state; and he is bound thereby.

In Equity.   On demurrer to bill.

Dos Passos Bros., Battle & Marshall, and Joseph Def. Junkin, for complainant.

Alexander & Green, William D. Guthrie, and Allan McCullon, for defendant.

HAZEL, District Judge.   This suit in equity was brought by a citizen of the state of Maryland against the defendant, the Equitable Life Assurance· Society of the United States, a corporation organized in the year 1859 to effect life insurance upon the plan of what is commonly known as mutual insurance, under the general laws of the state of New York, passed June 24, 1853, and acts amendatory thereof.   The orator is a holder of a policy, and this action is in his behalf, and in behalf of such other policy holders and annuitants in the defendant company as may choose to join in the bill.   The issues have arisen upon the defendant's demurrer to the complaint.   The grounds of demurrer are:   First, that no cause for equitable relief is stated; second, that there is adequate remedy at law; third, that this action is not maintainable except upon the application of the Attorney General of the state or after his approval, as provided by section 56 of the insurance law of the state (Laws N. Y. 1892, p. 1958, c. 690); and the general ground that no cause of action is stated in the bill.   Other grounds of demurrer were assigned, but they need not be specially stated, as the principal grounds argued at the bar were those herein mentioned. The object of the bill is to secure an accounting, to protect and conserve the rights and assets of·the policy holders while a reorganization of the defendant company is being perfected; and, further, that the net surplus when ascertained be equitably apportioned among the various policy holders past and present, under the supervision and control of the court and its receiver.   The questions.submitted are of great importance to a multitude of interested persons, 560,000 in number, who are insured in the defendant company, and to the public generally.   The legal principles involved directly affect important contractual rights and obligations, while the faithfulness and rectitude of the officers of the society (though not joined as parties), in whom hitherto the complainant has reposed reliance and confidence, are challenged. The decision of this controversy upon purely equitable grounds is a grave responsibility, and one which requires diligent and painstaking consideration of the various propositions involved and. arguments submitted ·in behalf of a suitor who invokes the intervention of a federal tribunal to redress alleged wrongful and fraudulent acts committed by the defendant.

The complaint is very lengthy, and is accompanied by Exhibits C and D, which constitute the report of an investigating committee

from the board of directors of the defendant, and the report of the superintendent of insurance of the state of New York. The point that the bill does not state a cause of action practically includes all the grounds of the demurrer and must be determined upon an examination of the complaint in connection with the relations which the suitors sustain to one another. A summary of the salient features of the bill follows. It is alleged that wrongful and fraudulent acts were committed by the Equitable Life Assurance Society, resulting in the spoliation of its assets, on account of which the complainant claims to be deprived of certain property rights and distributive interests in the accumulations of the society, which inured to him and the policy holders under the intendment of the contract of insurance. The bill proceeds upon the theory that the relationship under the policy between the assured and the society was of a fiduciary character, and that the assets in its possession and control were held solely by it as trustee for the policy holders. The defendant was incorporated with a capital stock of $100,000 divided into 1,000 shares of the par value of $100 each. The charter, after providing for a transference on the books of the company of the capital stock, and that the holders shall be entitled to receive a semiannual dividend thereon not to exceed $3\frac{1}{2}$ per cent., states that the dividends shall be paid at the times and in the manner designated by the directors, and that "the earnings and receipts of said company, over and above the dividends, losses, and expenses, shall be accumulated." A policy of insurance dated January 12, 1876, was issued to the orator to the amount of $25,000, and in consideration of future payments of premiums the society promised to pay said amount upon the death of the assured to his wife, if living, or, if not living, to his surviving children, and, if none survive him, then to his executors and administrators. Said policy of insurance, which is known as a straight life policy, is still in force, and was accepted by defendant upon the condition that certain provisions printed on the back thereof should become a part of the contract. Among other provisions, is the following:

"This policy, during its continuance, shall be entitled to participate in the distribution of the surplus of this society, by way of increase to the amount insured, according to such principles and methods as may, from time to time, be adopted by this society for such distribution, which principles and methods are hereby ratified and accepted by and for every person who shall have or claim any interest under this contract, but the society may, at any time before a forfeiture, upon the request of the person holding the absolute legal title to this policy, substitute a cash payment, to be fixed by said society, in lieu of the said increase to the amount insured, and such payment may be made by reduction of subsequent premiums, if said policy holder shall so elect."

All the premiums were paid by complainant as required by the rules and regulations of the society, and he elected to receive his share of the surplus in reduction of the premiums due from him upon a basis of the equitable share thereof. Such election by the complainant was ratified and accepted by the defendant. He claims, however, that the real dividends, i. e., the actual proportionate share of the accumulations or "true surplus" has never been equitably distributed; in short, that the society, instead of crediting him with the full share

to which he deems himself equitably entitled, has only credited a portion, retaining a large amount of said net surplus and wrongfully appropriating the same. In this situation, the bill avers the stockholders of the society wrongfully and fraudulently claim to own the surplus as an earning of their capital stock. A schedule showing the amount of outstanding assurance, together with the assets, liabilities, and surplus of the society since its organization, is incorporated in the bill, and it appears that in the year 1904 the surplus amounted to the enormous sum of $80,794,269 over and above the amount required by the statutes of the state to be reserved to pay the society's outstanding obligations and liabilities. It is asserted that a large surplus such as that stated is contrary to law, and entirely unnecessary for the prudent and righteous management of the society's affairs; that its ascertained surplus is fraudulently diverted and retained, the complainant meanwhile being deprived of the benefits thereof; that the discretion vested, under the charter of the society, in its directors and officers, has been flagrantly abused; and that, under the principle and method adopted by the society for the distribution of its surplus, $10,000,000 is improperly retained and dishonestly diverted by the defendant, which claims that such surplus and profits do not belong to the policy holders; that the failure to make equitable distribution by virtue of the authority conferred upon the society is to enable it to buy securities from syndicates formed by its directors and officers, at higher prices than the prices agreed to be paid therefor by such directors or managers; and that the object of such method of transacting the business of the defendant was to accumulate an illegal fund, out of which wasteful and extravagant salaries and expenses might be paid; that there is dissension in the board of directors.

It is also alleged that the control of the majority of the capital stock has passed into the possession of one Ryan, it having been sold and transferred to him by the former owner, one Hyde, for the sum of $2,500,000; that said Ryan, notwithstanding the delivery by him of a deed of trust, is the managing spirit of the society, and is illegally carrying on its business. Insolvency of the defendant corporation is set forth in the bill as follows:

"That the said society is responsible in law and equity to the policy holders for excessive sums paid in the way of salaries and fees, and also for all sums of money and damages consequent upon fraud, waste, neglect or willful mismanagement of the property and affairs of the society. That these sums amount at the present time to many hundred thousands of dollars in excess of the capital of $100,000, and as to which your orator and the other policy holders are entitled to an accounting, and the society has no funds with which to meet these enormous losses, but is insolvent. The property of the defendant is now in the hands or under the control of the stockholders, whose representatives have been guilty of misappropriation, waste, fraud and neglect in the management of its affairs and property. The business and affairs of the society are at a standstill; its morale as an insurer is destroyed; whatever business it may do will be at an enormous loss and sacrifice on the part of the present policy holders. Their supreme interest is to place the assets in the hands of competent receivers, appointed by this court, and to gradually, prudently and economically wind up the affairs of the company. In this way only can the policy holders and annuitants be protected from eventual and irretrievable loss."

The bill further avers that the orator has no adequate remedy at law; that irreparable injury by a continuance of the wrongful acts specified is threatened, and therefore there should be a discovery with an accounting under the direction of the court.

The first contention of the complainant is that, as the policy of insurance under the contract is upon the principle of mutuality, the assets of the defendant are held in trust for the benefit of the assured. Undoubtedly, an element of trust and confidence is present in an arrangement by which life insurance becomes payable according to the terms of the policy upon compliance by the assured with the imposed conditions. If the contract of insurance is broken by the insurer, it may not be inapplicable to state that there was a breach of trust in a broad sense, although the remedy to enforce the liability of the company would not be for a fiduciary debt. The rights and liabilities out of such a relationship spring entirely from the contract and are simply those of creditor and debtor. Such is the uniform holding of the decisions. The cases herein cited hold that contracts of insurance upon lives are not essentially different from ordinary agreements, and they must be interpreted and governed by the ordinary legal principles. St. John v. American Mut. Life Ins. Co., 13 N. Y. 31, 64 Am. Dec. 529; Greeff v. Equitable Life Assur. Soc., 24 Misc. Rep. 96, 52 N. Y. Supp. 503, affirmed 160 N. Y. 19, 54 N. E. 712, 46 L. R. A. 288, 73 Am. St. Rep. 659.

The claim that the defendant has failed to equitably apportion the earned accumulations does not in the first instance operate to bind said defendant to render an accounting to a policy holder. It will be observed that the insured, by the terms of his policy, becomes entitled to certain accretions to the fund of the society which are apportionable according to previously adopted principles and methods. He is entitled to participate in the distribution which the society, in the exercise of its discretion, concludes to make. Under the provisions of the charter, the insured has the privilege of preferring a cash payment in reduction of his premium, the amount to be determined as provided in the contract; that is to say, he was entitled to have accredited an equitable share of the surplus. Whether the distribution of only a portion of the net surplus was an equitable share thereof is a question not free from difficulty, although it is not denied that such distribution was made according to principles and methods adopted by the society. Having carefully examined the authorities to which attention is directed, I have reached the conclusion that the effect of the language of the charter that "each policy holder shall be credited with an equitable share of the said surplus" depends upon the sagacity and discretion of the directors who are directly charged with the responsibility of conservatism in the management of the affairs of the society.

The question is admittedly of material importance. It has heretofore several times been held that the charter of the society reasonably construed does not provide for a division or allotment of the entire surplus. In Greeff v. Equitable Life Assur. Soc., supra, Martin, J., speaking for the court, says:

"What it [the charter] does provide is that, when ascertained, each policy holder shall be credited with an equitable share of the surplus, to be deter- over and above the dividends, losses, and expenses, shall be accumulated. mined and applied in the manner stated, and that the earnings and receipts, Hence, if we assume that the charter and not the contract it to control (which we by no means hold), then the question at once arises who is to determine what an equitable distribution of the surplus is? Or, in other words, the question is, who is to determine how much of the surplus shall be distributed to the policy holders, and how much shall be accumulated and retained for the security of the society and its members?"

Complainant contends that, though wise and prudent management of the affairs of the society is required of its officers and directors, yet upon the ascertainment of the net surplus the society is obliged under the terms of the policy to equitably apportion the entire fund. Such, it is urged, was the insurance contract; for, if otherwise, it would be a fraud upon the policy holders, who are induced to contract under the supposition that they will become interested in the profits. Counsel for the complainant argues that any other conclusion does violence to the principle of mutual insurance. The construction, however, placed by the Court of Appeals in the Greeff Case upon the word "surplus," as employed in the defendant's charter, apparently does not refer to a distributable surplus, but simply represents the fund or surplus on hand after certain contingent liabilities were deducted and taken into consideration by the board of directors in fixing the surplus which in the judgment of the board should be apportioned. The court says:

"When that amount was ascertained, it became the duty of the officers of the defendant to determine the portion of such surplus which should be distributed and the portion which should be retained for the benefit and security of the company and its members."

Emphasis is placed upon the facts inferable from the contract that the directors were clothed with a discretion to positively and definitely state the amount of an apportionable surplus, as distinguished from the surplus prior to ascertainment of the amount appropriated for the benefit of the policy holders. This proposition was again recently considered in Buford v. Equitable Life Assurance Society of the United States, 98 N. Y. Supp. 152. The opinion states:

"The legal reserve required to be maintained by every life insurance company is ascertained upon rules laid down by statute (sections 84 and 86, Insurance Law; Laws N. Y. 1892, p. 1968, c. 690. The directors and officers of the company have no discretion to exercise concerning it. It assumes as factors for its computation a valuation of the assets of the corporation, the nature and extent of its outstanding policies, a specified experience table of mortality, and a stated rate of interest. It may be said to represent the minimum sum necessary to have in hand to avoid the imputation of insolvency. The amount to be set aside under the defendant's charter to cover all outstanding risks and other obligations is left to the determination of the officers of the company. * * * There is nothing in the charter which would justify a belief that, when its framers provided for setting aside a portion of the surplus to meet the existent and prospective claims, they had in mind what is now known as the statutory legal reserve, or that they intended to limit the officers to setting apart that amount and no more."

In Uhlman v. N. Y. Life Ins. Co., 109 N. Y. 421, 17 N. E. 363, 4 Am. St. Rep. 482, the Court of Appeals, Judge Peckham writing for the court, after remarking that the apportionment under the agree-

ment should be an equitable one, and that the question of what is an equitable one is determinative upon the facts and circumstances over which courts have control, says:

"Prima facie, apportionment, as made by the defendant, should be regarded as a compliance with the terms of the policy, or, in other words, should be regarded as an equitable apportionment. * * * And the plaintiff and all others similarly situated have the right, upon proper allegations of fact showing that the apportionment made by the defendant is not equitable, or has been based upon erroneous principles, to have a trial and make proof of such allegations, and, if proved, the court will declare the proper principles upon which the apportionment is to be made so as to become an equitable apportionment."

Later, in the Greeff Case, the Court of Appeals, considering this question, says:

"Manifestly, that question is to be decided by the officers and managers of the defendant, who are to exercise their discretion in determining it, having in view the present and future contingencies of the business. In the absence of any allegation of wrongdoing or mistake by them, their determination of the question must be treated as proper, and their apportionment of the surplus is prima facie to be regarded as equitable."

Counsel for complainant insists that the decisions from which excerpts have just been taken show that, though an action at law is untenable, equity will afford proper relief; it being charged in the bill, inter alia, that the officers of the company abused their discretion in relation to the surplus. This, it is thought, is a strained interpretation of the decisions in the Uhlman and Greeff Cases, for, as there held, the policy holder has no actual interest in the surplus until it is equitably apportioned. The bill is not framed to compel the officers to act or to require them to perform their duties. Indeed, dividends have at different times been declared, but the amount thereof, or to what extent, does not appear. So that, in my judgment, the remedy in equity indicated in the above cited cases refers to instances where there is an absolute failure by the officers to ascertain and apportion the surplus. Numerous authorities to which attention is directed are decisive in their holding that no trust relationship is established under a contract such as that in question. It will be necessary only to refer to a few of them. In Bewley v. Equitable Life Assur. Soc., 61 How. Prac. 344, a policy holder claimed that the society and its directors held its surplus profits in trust for the policy holders. He alleged a breach of trust, mismanagement, and misappropriation of the assets of the society by its officers. The court held that no trust was created, and, moreover, that policies of insurance are governed by the ordinary principles. This principle finds unquestionable support in People v. Security Life Ins. Co., 78 N. Y. 114, 34 Am. Rep. 522; Cohen v. N. Y. Mutual Life Ins. Co., 50 N. Y. 610, 10 Am. Rep. 522; Taylor v. Charter Oak Life Ins. Co., 59 How. Prac. 468; Swan v. Mutual Reserve Fund Life Ass'n, 20 App. Div. 255, 46 N. Y. Supp. 841; Everson v. Equitable Life Assur. Soc. (C. C.) 68 Fed. 258, affirmed (Third Circuit) 71 Fed. 570, 18 C. C. A. 251; Hunton v. Equitable Life Assur. Soc. (C. C.) 45 Fed. 661; and Pierce v. Equitable Life Assur. Soc., 145 Mass. 56, 12 N. E. 858, 1 Am. St. Rep. 433. These decisions are not inapplicable to the present case, and, I

think, correctly state the law. In the light of events adverted to in the bill, such enunciated principle may be regarded as constrained and exacting, but, beyond doubt, it was thereby intended to insure both the safety and security of the policy holders and life assurance societies.

No useful purpose will be served by a further statement of any independent views, inasmuch as I conceive it to be my duty upon these questions to follow the decisions of the highest tribunal of the state of New York, the state whose Legislature created the defendant, and by whose laws the contract must be governed and controlled. The objection that there is no trust or fiduciary relationship such as alone entitles complainant to maintain this suit, is sound. I now come to briefly discuss the question of waste and wrongful acts alleged to have been committed by the officers of the society. The Frick report and the report of the state superintendent of insurance, Exhibits C and D attached to the bill, are claimed to show such wrongdoing. But I do not think that complainant has a right to equitable relief in the present form of the bill because of such asserted wrongdoing. The society has the unquestionable power to redress such wrongful acts by the ordinary legal instrumentalities, inasmuch as they were not committed against the complainant, a holder of a policy. His interests, as said, are distinctly under the contract, which does not contemplate a management by the policy holder of the business of the society, or even a right to "dictate the amount of the dividend it shall declare, or question the result after the discretion of its managers has been exercised in this behalf." Fuller v. Knapp (C. C.) 24 Fed. 105.

Upon the question of the insolvency of the defendant, assuming complainant's right to invoke the jurisdiction of the court on account thereof, it is only thought necessary to say that the material averments upon this subject contained in the bill, together with Exhibits C and D, negative such claim. Indeed, a careful reading of the complaint leads to the conclusion that the society is solvent and abundantly able to meet all its obligations.

Neither is the complainant, in the absence of a trust relation or other grounds of jurisdiction, entitled to an accounting. Hunton v. Equitable Life Assur. Soc., supra; Everson v. Equitable Life Assur. Soc., supra. In the latter case, the complainant sought an accounting and discovery in aid thereof, solely because no account by the defendant insurance company had, on demand, been made. The questions before the court were on demurrer to the bill, and Judge Buffington said:

"An alleged breach of contract obligations, and the ensuing accountability to answer in damages therefor, do not necessarily imply liability to an accounting by bill in equity. In other words, accountability does not imply liability to an accounting in equity. But prior liability to so account is the foundation upon which a bill in equity for an accounting rests."

And the opinion continues:

"But, unless there was a duty to account, the complainant cannot base his bill on respondent's failure so to do, for such refusal was not a denial of what complainant was entitled to demand."

Hence, this not being a controversy for the adjustment of complicated or mutual accounts between the parties, I am of opinion that Judge Buffington correctly states the rule, and that an accounting and discovery must be regarded as incidental to the principal grounds upon which the jurisdiction of the court is based. Such is the holding of the cases. Hare on Discovery, §§ 6–8; Story's Eq. Pl. § 331; Safford v. Ensign Mfg. Co., 120 Fed. 480, 56 C. C. A. 630; Preston v. Smith (C. C.) 26 Fed. 884.

Another objection, namely, that section 56, c. 690, p. 1958, of the Laws of 1892 of the state of New York expressly prohibits the appointment of a receiver and an accounting unless the Attorney General makes the application or approves the same, will now be considered. This provision is restrictive in its nature, and its binding force apparently depends upon whether the state statutes are a part of the contract. It is well settled that a holder of a policy, even though a citizen of a foreign state, is presumed to know the provisions of the statute from which the insurance corporation obtains its existence. That the assured is bound by the provisions of the charter, by-laws, and rules of the company scarcely needs citation of authorities. Upon making formal application for insurance, the complainant expressly consented that the affairs of the company were to be managed and regulated under the provisions of the statute. It is not shown that the policy in question was surrounded by any special conditions or circumstances. True, the statute in question had not then been enacted, but this is immaterial, as the charter in terms provides that the company shall "be subject to all the regulations, restrictions and obligations" imposed by the act of June 24, 1853, and subsequent amendments thereto, under which, as we have seen, the society was incorporated.

Complainant contends that the statute is simply descriptive of the remedy and does not effect redress in a proper case in equity, and numerous cases are cited to show that a state statute cannot deprive a federal court of its jurisdiction. This as a broad, general proposition, is absolutely true; that is to say, the equity jurisdiction of the courts of the United States are not confined or restricted by state statutes. But, in my view of this controversy, we are not here concerned with the curtailment or restriction of the equity powers of this court, and the cases cited are distinguishable from the point under discussion. They are principally concerned with controversies where an attempt has been made by the state statutes to limit jurisdiction to a particular state court and to confine the remedy to that forum. Where, however, the contract of insurance subjects the assured to "the operation of the organic law of a corporation by becoming a member of it" a different principle, beyond doubt, governs the status of the parties. Rundel v. Life Ass'n of America (C. C.) 10 Fed. 720; Fry v. Charter Oak Life Ins. Co. (C. C.) 31 Fed. 197; Relfe v. Rundle, 103 U. S. 222, 26 L. Ed. 337.

In Canada Southern Railroad Co. v. Gebhard, 109 U. S. 527, 3 Sup. Ct. 363, 27 L. Ed. 1020, the Supreme Court, speaking of the rights and liabilities of persons who subject themselves to the laws of a corporation of a foreign country, says:

"But wherever it goes for business it carries its charter, as that is the law of its existence; * * * and the charter is the same abroad that it is at home. Whatever disabilities are placed upon a corporation at home it retains abroad, and whatever legislative control it is subject to at home must be recognized and submitted to by those who deal with it elsewhere."

So, in this case, the defendant is entirely controlled by the statute under consideration, and the doctrine quoted is thought not inapposite. The statute has been upheld and approved by the Court of Appeals of this state. In Swan v. Mutual Reserve Fund Life Ass'n, 155 N. Y. 9, 49 N. E. 258, it is said:

"In this enactment we have an express declaration of the Legislature upon the subject, which may be regarded as voicing a policy of the law. * * * It cannot be said that the enactment of such a law is without good reason, or is against a wise public policy."

The opinion further states as follows:

"Nor is the act at all in violation of any constitutional right of the plaintiff, as impairing the obligation of a contract. It furnishes a remedy * * * and prescribes a method of procedure by which that remedy may be applicable to every person situated as the plaintiff is."

This view of the statute has been distinctly approved in the Greeff Case, supra. In Relfe v. Rundle, supra, an insolvent life insurance company was dissolved by order of the court, and the assets under the statutes of the state of its creation were vested in the superintendent of the insurance department. Held that, as the statute was in existence at the time the charter of the company was granted, it became a part thereof, and the law which clothed the superintendent with power to wind up the affairs of the corporation was binding upon the complainant, a citizen of Missouri. This would seem to be an approval of the contention that section 56 of the insurance law of this state is embraced in the contract. Much was said at the hearing in relation to the charge that the society had appropriated $10,000,000 out of the net surplus, which it claimed belonged to the stockholders, and not to the policy holders. In the view taken by me of the principal issues involved and the conclusions reached thereon, a decision on this point, of course, is not essential. It follows that complainant has no legal capacity to bring this suit, and no cause of action is stated in the bill.

The demurrer is sustained, with costs, and the bill dismissed.